Carolene Products Company, Appellant,
*v.* Harter et al.

Argued November 29, 1937. Before SCHAFFER, MAXEY,
DREW, LINN, STERN and BARNES, JJ.

*George N. Murdock,* with him *Sterling McNees,* of *McNees, Hollinger & Nurick,* for appellant.

*Harry Polikoff,* Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, for appellees.

*A. Evans Kephart,* for interested parties, under Rule 61.

*Morris Duane,* with him *Roland S. Morris,* of *Duane, Morris & Heckscher,* for interested party, under Rule 61.

OPINION BY MR. JUSTICE STERN, January 31, 1938:

This is an appeal from the refusal of the court below to enjoin defendants from seeking to prevent the sale in Pennsylvania of a product marketed by plaintiff.

Plaintiff is a corporation of the State of Michigan, and sells, under the trade names of "Carolene" and "Milnut," a food compound which is manufactured for it at Litchfield, Illinois, and Warsaw, Indiana. This product is made by evaporating skimmed milk (that is, whole milk from which the butterfat has been removed[1]), thus reducing it to its constituent solids, and then adding a certain percentage of cocoanut oil. It is sold in hermetically sealed tin cans, each bearing a label which truthfully describes the product as "A compound

---

[1] The butterfat is either made by plaintiff into butter or sold as cream.

of refined nut oils and evaporated skimmed milk," and states that it is "Especially prepared for use in coffee, baking and for other culinary purposes," and is "not to be sold for evaporated milk." Of course, the cocoanut oil is much cheaper than the butterfat which it replaces, and therefore plaintiff's product can be, and is, sold at a lower price than ordinary evaporated or condensed milk.

When plaintiff attempted to sell "Carolene" and "Milnut" in Pennsylvania, defendants, acting for the Department of Agriculture of the Commonwealth, gave notice that such sales constituted a violation of the laws of the State, and should be discontinued under penalty of criminal prosecution.

The Act of March 21, 1923, P. L. 28, entitled, "For the prevention of fraud and the protection of the public health; relating to milk, cream, or skimmed milk, . . . prohibiting the introduction of foreign fats into them . . .," provides, section 3, that "It shall be unlawful . . . to manufacture, sell . . . or have in possession with intent to sell . . . any milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to or with which has been added, blended, or compounded any fats or oils, other than milk fats, either under the name of said products or articles or the derivatives thereof, or if labeled under any fictitious, coined, or trade names whatsoever: . . ."

The Act of June 29, 1923, P. L. 929, a supplement to the preceding act, provides, section 2, that: "It is unlawful . . . to manufacture, sell, . . . or have in possession with intent to sell . . . any condensed, concentrated, or evaporated skimmed milk, or any compound of any kind containing skimmed milk, . . . in hermetically sealed cans or receptacles, unless such can or receptacle shall contain at least five pounds net weight, and shall have plainly marked, printed, or indicated thereon the words, 'Concentrated Skimmed Milk,

. . .' and immediately thereunder the words 'Unfit For Infants,' which required words shall be printed in dark block type at least one-half inch in height and one-half inch in width upon a light colored background, . . . It is unlawful . . . to manufacture, or sell . . . or have in possession with intent to sell . . . any condensed, concentrated, or evaporated skimmed milk labeled under any fictitious or coined or trade name whatsoever."

It will be noted that whereas the March statute prohibited entirely the sale of "filled milk," the June act is merely regulatory, and permits the sale of skimmed milk compounds if packed in hermetically sealed cans with a specified minimum content and label. It is plaintiff's contention that both acts violate the Fourteenth Amendment of the Constitution of the United States in that they deprive plaintiff of its property without due process of law, and discriminate against its product by permitting the manufacture and sale of other articles containing the same ingredients. It asserts that "Carolene" or "Milnut" is wholesome, and in no way harmful to public health, and that the provisions limiting its sale to certain sized cans with prescribed labels are arbitrary and unreasonable and bear no logical relation to the public welfare.

According to the findings of fact by the court below, all of which are amply supported by the evidence, it appears that filled milk, while not deleterious, does not have the nutritive value of whole milk, because butter-fat, which filled milk lacks, is rich in vitamin A and forms one of the most desirable and even vital constituents of natural milk; that although plaintiff does not, either by its labels or sales propaganda, misrepresent its product, confusion and deception arise from the fact that it cannot be distinguished from evaporated milk in taste, odor, appearance or consistency; that frequently retail grocers and markets advertise and sell "Carolene" and "Milnut" as milk, or evaporated or canned milk, not

revealing that it is merely a *skimmed* milk compound; that even the Babcock test, which is the standard method for determining the fat content of milk, does not reveal the presence of cocoa fat as distinguished from butter-fat, since it reacts similarly to both, and nothing but a chemical analysis can disclose the substitution; that plaintiff's product is packed in cans similar to those in which condensed milk is sold, and an unwary purchaser who does not carefully read the label, or make pointed inquiry, is quite apt to purchase the skimmed milk compound in the belief that it is the same as evaporated milk.

The facts thus established make the case analogous to that which presented itself to this court and to the Supreme Court of the United States in *Powell v. Commonwealth*, 114 Pa. 265, affirmed in *Powell v. Pennsylvania*, 127 U. S. 678. It was there held that the State could prohibit the manufacture and sale of oleomargarine even though that product was not injurious.[2] The Supreme Court of Pennsylvania said (p. 295): "The test of the reasonableness of a police regulation prohibiting the making and vending of a particular article of food, is not alone whether it is unwholesome and injurious. If an article of food is of such a character that few persons will eat it knowing its real character; if, at the same time, it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing that the only way to prevent the public from being defrauded into the purchasing of the counterfeit article for the genuine is to prohibit altogether the manufacture and sale of the former,—then we think such a prohibition may stand as a reasonable police regulation,

---

[2] Oleomargarine, like "Carolene," is composed principally of cocoanut oil and skimmed milk,—80 to 90% of the former and 10 to 20% of the latter.

although the article prohibited is in fact innocuous, and although its production might be found beneficial to the public, if in buying it they could distinguish it from the production of which it is the imitation." In the United States Supreme Court it was said (p. 685) : "Whether the manufacture of oleomargarine, or imitation butter, . . . is, or may be, conducted in such a way, . . . as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine."

In *Hebe Company v. Shaw*, 248 U. S. 297, the validity of an Ohio statute was sustained which forbade the sale of condensed skimmed milk. The court said it was immaterial that "Hebe," which, like "Carolene," was made by the addition of cocoanut oil, was wholesome; that the intention of the act being to secure a certain minimum of nutritive elements and to protect the public from "the fraudulent substitution of an inferior product that would be hard to detect," it was for the legislature to exercise its own judgment as to the extent to which it should go in accomplishing that objective, short only of arbitrary or unreasonable exercise of the power ;[3] and that the addition of the cocoanut oil to the skimmed milk made the resulting compound all the more available as a fraudulent substitute for the dearer and better article.

---

[3] In the present case it is not without great significance that not only Congress but thirty-eight of the states have enacted laws prohibiting or to some extent regulating the sale of filled milk. This would seem to be striking proof of the fact that such legislation in our own state does not represent arbitrary action on the part of the legislature.

Some of the state courts have invalidated acts prohibiting the manufacture or sale of filled milk: *People v. Carolene Products Co.*, 345 Ill. 166, 177 N. E. 698; *Carolene Products Co. v. Thomson*, 276 Mich. 172, 267 N. W. 608; *Carolene Products Co. v. Banning*, 131 Neb. 429, 268 N. W. 313; *Carolene Products Co. v. McLaughlin*, 365 Ill. 62, 5 N. E. (2d) 447. On the other hand, such an act was declared constitutional in *State v. Emery*, 178 Wis. 147, 189 N. W. 564 (see, however, *John F. Jelke Co. v. Emery*, 193 Wis. 311, 214 N. W. 369). The federal Act of March 4, 1923, 21 U. S. C. A., Sections 61 to 63 inclusive, prohibiting the shipment of filled milk in interstate commerce, was held unconstitutional in *United States v. Carolene Products Co.*, 7 Fed. Supp. 500, but valid in *Carolene Products Co. v. Evaporated Milk Association*, 93 Fed. (2d) 202. It scarcely need be pointed out, however, that where invalidity of a state act is claimed because of an alleged violation of the federal constitution, the decisions of the Supreme Court of the United States are controlling. Plaintiff urges that the conclusion reached in *Powell v. Pennsylvania* was weakened by the case of *Schollenberger v. Pennsylvania*, 171 U. S. 1, which held the oleomargarine statute unconstitutional so far as it attempted to prevent the importation of that article into the state from without, and its sale in the original package.[4] (See also *Collins v. New Hampshire*, 171 U. S. 30, and compare with *Plumley v. Massachusetts*, 155 U. S. 461.) Plaintiff further relies upon *Weaver v. Palmer Bros. Co.*, 270 U. S. 402, which held invalid a statute of Pennsylvania forbidding the use in quilts or comfortables of shoddy, even though sterilized, the court point-

---

[4] The Act of March 21, 1923, P. L. 28, involved in the present case, provides, section 7, that it is not to be construed as prohibiting the shipment into the Commonwealth from a foreign state, and the first sale thereof, in the original package, of any of the products the manufacture, sale or possession of which are prohibited by the terms of the act.

ing out that the evidence established that sterilization eliminates the danger, if any, from the use of shoddy, and therefore the act could not be sustained as a health measure, nor was it necessary to prevent deception, since regulations in the act or others that were adequate might be applied for that purpose. However, the *Powell* and *Hebe* cases, either or both, have been cited by the United States Supreme Court with approval almost continuously down to the present time, notably in *Capital City Dairy Co. v. Ohio*, 183 U. S. 238, 246; *Hammond Packing Co. v. Montana*, 233 U. S. 331, 333; *Hoeper v. Tax Commission*, 284 U. S. 206 (where it was said in a dissenting opinion by Mr. Justice HOLMES, pp. 220, 221: "It has been decided too often to be open to question, that administrative necessity may justify the inclusion of innocent objects or transactions within a prohibited class.") ; *Nebbia v. New York*, 291 U. S. 502, 528; *Semler v. Dental Examiners*, 294 U. S. 608, 613; *Baldwin v. G. A. F. Seelig, Inc.*, 294 U. S. 511, 525.

It would seem to be settled, therefore, by the Supreme Courts of our own State and the United States, that even such a wholly prohibitory act as the March statute is within the constitutional power of the legislature. As stated in *Commonwealth v. Crowl*, 52 Pa. Super. Ct. 539, 545, affirmed per curiam in 245 Pa. 554: "It is not a successful denial of the exercise of these powers to say that the prohibited article is wholesome and not injurious to the consumer. The wholesomeness of the prohibited thing will not render the act unconstitutional. The temptation to fraud and adulteration may be a consideration leading to regulative or prohibitive legislation." Nor is the act discriminatory, as plaintiff contends, because it does not prohibit the sale of other food products containing either skimmed milk or cocoanut oil, or both, as an ingredient,—for example, oleomargarine, milk chocolate, confectionery, wafers and crackers. This argument overlooks the fact that where the combination of evaporated skimmed milk and cocoa-

nut oil is easily mistaken for ordinary condensed milk, the probability of extensive deception in the sale of so unique and vital a human food as milk justifies the legislature in prohibiting the sale of such a product without similar action in regard to articles not thus likely to be confused with other foods of superior nutritive value. Of course, filled milk may properly be classified as different from whole milk, and plaintiff is treated in the same manner as all other manufacturers and sellers of filled milk.

However, even if the legislature could not, as in the March act, entirely prohibit the sale in Pennsylvania of "Carolene" and "Milnut," plaintiffs would still be confronted by the barrier of the June statute permitting such sale if in accordance with the regulations therein prescribed. Between the time when the March act was passed and the passage of the June supplement, the legislature apparently came to realize that the use of filled milk as a food product was probably not harmful for adults and, as to them, its sale might safely be permitted, but the legislature was still firmly of the opinion that if filled milk were relied upon as a diet for infants grave malnutrition would result. The legislature had before it evidence to the effect that the butterfat in natural milk—the animal fat which nature provides in mammals for suckling their young—performs a unique biological function as a food, largely because of its vitamin A content, that when infants are deprived of this milk constitutent they are subject to retardation of growth and to the inroads of scurvy, rickets, respiratory diseases, and even afflictions of the eye; and that, in general, there is no efficient substitute for whole milk in infant diet. It is true that pediatricians recommend that children be given orange juice, tomato juice, cod-liver oil and other substances, because, though the most nearly perfect of foods, even natural milk is not wholly sufficient for infant feeding, but the peril of defective nutrition is much greater with the use of filled instead

of whole milk. It appears, too, from the evidence in the present case that housewives, especially among the poorer classes of people, are apt to purchase products such as those sold by plaintiff without realizing or knowing that they are not getting a concentrate of whole milk, but a substance which, from the standpoint of food value, is deficient for the feeding of their children; the fact that plaintiff's product is cheaper in price than condensed or evaporated milk naturally lures them into its purchase. The legislature, taking all this into consideration, and having in mind, therefore, that even though there be no misrepresentation by plaintiff as to the ingredients in its product, mothers, through ignorance, were likely to be deceived as to its inferior value for nutritive purposes, decided that while the ban might be lifted from such a product for other purposes, it should still remain in force as to its sale for infant feeding. In order to accomplish this result, the legislature passed the June statute, providing that evaporated skimmed milk or any compound containing it could be sold in hermetically sealed cans or receptacles if these contained at least five pounds net weight, were labeled "Unfit for Infants," and were not sold under a fictitious or trade name.

Plaintiff contends that these regulations are arbitrary and not logically designed for the attainment of any proper end. It argues that if its product is wholesome its sale should be permitted; if unwholesome, it is no less so if sold in large cans. The argument is plausible but fallacious. Plaintiff's witnesses all admitted that if, instead of its product being sold principally in 14½-ounce cans as at present, it were packed in five-pound cans, it would be purchased only by restaurants, hotels, confectioners and other users of the product in bulk, but not by mothers and housewives, partly because of the larger outlay required, and partly because the contents of such large cans would outlast the period during

which the product would remain fit for domestic consumption. Thus the regulation as to the size of the cans, the provision as to the label, and the prohibition of the sale under a trade or fictitious name, are all aimed to accomplish the desired objective of discouraging and practically rendering impossible the purchase of filled milk for use as a diet for infants. Being reasonably suited to accomplish a proper purpose, such regulations are not prohibited by the Constitution. It may be that a less drastic label, as, for example, "Not sufficiently nutritive for infants," would have served the purpose, but the regulations and restrictions adopted by the legislature being within the general scope of its power, and not being unreasonable, it is for that branch of the government, not the courts, to determine the exact methods to be employed to promote the public health, welfare and safety: *Armour & Co. v. North Dakota,* 240 U. S. 510; *Hutchinson Ice Cream Co. v. Iowa,* 242 U. S. 153; *Petersen Baking Co. v. Bryan,* 290 U. S. 570. While the June act does not attempt to impose regulations upon the sale of ordinary skimmed milk unless it is either concentrated or compounded, this does not work any improper discrimination, because, while skimmed milk is, of course, equally unfit for infants, it is so commonly distinguished and its true nature so well known by all likely purchasers that there is not involved the same probability of misapprehension and deception in its sale as in the case of its canned concentrates and compounds. At best this was a subject properly within the reasonable discretion of the legislature.

In conclusion, it is but a platitude to state that because upon milk so largely depends the health of the race, it has always been the subject of special regulatory legislation,—notably laws forbidding its sale or that of its products if containing less than a stipulated minimum of butterfat. The latest and most comprehensive act in our state is the Milk Control Law of April 28,

1937, P. L. 417.[5]  By the terms of that act, as well as by judicial decision, the milk industry has been declared to be "affected with a public interest": *Rohrer v. Milk Control Board,* 322 Pa. 257; *Nebbia v. New York,* 291 U. S. 502.  Surely there is no conceivable subject of legislation more peculiarly within the police power of the State.  The Act of June 29, 1923,—apart from any question in regard to the constitutionality of the Act of March 21, 1923,—is so clearly a reasonable and proper regulation in the interest of the public health, especially of child welfare, that its validity is beyond question.

Decree affirmed; costs to be paid by appellant.

---

[5] Incidentally it may be noted that by the Act of June 5, 1937, P. L. 1672, it is made unlawful to sell ice cream if it contains any fats or oils, other than milk fats, added to or blended or compounded with it.  Such blending or compounding is declared to be an adulteration.