Commonwealth *v.* DiMeglio, Appellant.

Argued March 29, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, and WRIGHT, JJ. (WOODSIDE and ERVIN, JJ., absent).

*Lewis H. VanDusen, Jr.*, with him *Henry S. Drinker, Arthur D. Wingebach*, and *Lester E. Waterbury*, for appellants.

*L. G. Forer*, Deputy Attorney General, with her *Harry F. Stambaugh*, Special Counsel, *Samuel M. Jackson*, Deputy Attorney General and *Herbert B. Cohen*, Attorney General, for appellee.

OPINION BY WRIGHT, J., July 21, 1955:

Frank and Nick DiMeglio, proprietors of a restaurant and cafeteria in the City of Chester, were convicted in a summary proceeding before a Justice of the Peace on a charge of violating the General Food Law (Act of May 13, 1909, P. L. 520, 31 PS §1, et seq.) by offering for sale lemon pies "adulterated with yellow coal tar color". The Court of Quarter Sessions of Delaware County allowed an appeal and heard the case de novo. Subsequent to the taking of the testimony, the hearing Judge entered an order and decree (June 9, 1953) finding defendants guilty and directing that they appear ten days later for sentence. Within that period defendants filed a motion in arrest of judgment.

This motion was dismissed (November 24, 1953) and sentences of fine and costs were later imposed. These appeals followed.

Section 3 of the General Food Law provides, inter alia, that "an article of food shall be deemed to be adulterated . . . Fourth. If it be mixed, colored or changed in color . . . whereby damage or inferiority is concealed, or so as to deceive or mislead the purchaser; or if by any means it is made to appear better or of greater value than it is". Section 8 of the statute sets forth that the "Department of Agriculture of the State shall be charged with the enforcement of the provisions of this act and shall make rules and regulations for the proper enforcement thereof, including rules and regulations setting up definitions and standards of articles of food". Regulation 1003 of the Department provides as follows: "Bakery products . . . shall be free from added color, either of synthetic (coal tar) or natural origin. The addition of pumpkin, squash, carrots or other highly colored ingredients to bakery products, which may give the fictitious appearance of egg richness, is prohibited regardless of labeling".

In limine, we cannot agree with appellants that any controlling facts were first found in their favor. In his opinion of June 9, 1953, the hearing Judge did state: "The facts proved by the defense in this case are as follows". It clearly appears, however, that he was there contrasting the theory of the defense with the theory of the Commonwealth. Under the Act of April 18, 1919, P. L. 72, 12 PS 1165, it is our duty to review the testimony in order to ascertain whether there was sufficient evidence to sustain the order of the Court below. The evidence must be viewed in the light most favorable to the Commonwealth, which has the verdict: *Commonwealth v. Stroik,* 175 Pa. Superior Ct. 10, 102 A. 2d 239.

The pies in question were made from lemon pie filling purchased by appellant from the General Foods Corporation in five pound packages under the name "Jell-O Brand Lemon Flavor Pie Filling and Pudding". The label indicates that the ingredients are sugar, cornstarch, citric acid, salt, natural lemon flavor and U. S. Certified Color (containing coal tar), and directs purchasers to add fifteen egg yolks and a quantity of water to make sufficient filling for ten nine-inch pies. Dr. Harrisson, an expert chemist whose qualifications were conceded by appellants, testified that "natural lemon flavor" means lemon oil; that lemon oil is extracted from the rind and has a very slight yellow tinge which "would not carry into the finished product"; that a mixture of cornstarch, sugar, and lemon oil would produce a pie which would be "very insipid"; that acid must be added to make it acceptable, either natural citric acid or lemon juice; that, in either event, such a pie would be essentially white in color, nor would the use of ground lemon rind create a materially deeper yellow cast; and that the inclusion of egg yolks effects a more acceptable result, which would be "yellow in accordance with the amount of eggs you put in the product". Edward E. Hanscom, Jr., prominently identified with the baking industry for many years, testified that "a great proportion of the coloring" in his lemon pies "comes completely from egg yolks"; that the impression in the public mind "is the deeper color in lemon pie comes from eggs and egg yolks and the customer buys it with faith in that"; that eggs are symbols of richness and color; and that "it would be possible for a baker to make a pie with a very small amount of egg yolks and add coloring to make it look richer than it really is", in which event the cost of production would be considerably reduced.

. The testimony of the defense witnesses was that there is little relationship between the use of eggs and color. Joseph Axelrod, one of the merchandising managers of the General Foods Corporation, testified that the purpose in adding artificial color to the product is to "simulate the outside of a lemon". James L. Common, another company expert, testified that eggs are not added for coloring but to create "a creamy eating quality". Miss Kathryn Pennington, another company expert, testified that the artificial color is added to the product "from an eye appeal standpoint". As stated by Mr. Axelrod, "We put the color in to produce the color that the public expects in a lemon pie". Appellant Frank DiMeglio testified that lemon pies made with the Jell-O product cost twenty-seven cents each, as contrasted with a general wholesale price of fifty-five cents for the same size lemon pies purchased from bakeries.

In our view, the court below was justified under all the evidence in finding (1) that the purpose and effect of the use of the artificial coal tar dye in the Jell-O product was to conceal "inferiority"; (2) that purchasers of lemon pies made with the Jell-O product are being "deceived" by the use of artificial color; and (3) that such pies are thereby "made to appear better and of greater value" than they are. Our conclusion is that the decision of the lower court should be affirmed. It will be necessary to go into considerable detail in order to discuss the five questions which appellants have raised.

Appellants' first contention is that the addition of harmless U. S. Certified Color is not adulteration "when the purpose and effect of the addition is not to deceive consumers into believing it (a lemon pie) is something other than what it actually is, or that it contains something that it does not actually contain,

but is merely to give it the yellow appearance that consumers prefer in such a pie, and thus make it more attractive than it would be without such addition". Conceding arguendo that the artificial color is added only "to simulate the outside of a lemon", the deception contemplated by the statute still remains. Moreover, the lower Court was justified in finding that dark yellow colored lemon pies may be produced without the use of a dye and, as so produced, contain a greater number of egg yolks than appellants' pies. A pie containing more egg yolks is more nutritious and concededly represents greater value. It was not necessary for the Commonwealth to show that the Jell-O product was injurious to health. In *United States v. Two Bags, Each Containing 110 Pounds, Poppy Seeds*, 147 Fed. 2d 123, it was held that adding charcoal coloring to white poppy seeds concealed their true value and made the white seeds appear better or of greater value than they were. The adulteration was not deleterious or injurious to health, but it did make them saleable at a higher price. Similarly, in the case at bar, we find the type of deception which the General Food Law is designed to prevent.

Appellants' second contention is that there was no showing that the addition of artificial color "had the effect of deceiving the ordinary consumer into believing the pie to be another well recognized and superior article which is offered as a standard for comparison". Principal reliance is placed on *U. S. v. 88 Cases Bireley's Orange Beverage*, 187 Fed. 2d 967. There the Court of Appeals of the Third Circuit, construing that portion of the Federal Food, Drug, and Cosmetic Act which provides that food is deemed to be adulterated if any substance is added thereto to make "it appear better or of greater value than it is", said: "Without a finding that a marketable inferior product is likely

to be confused with a specified superior counterpart, we think there can be no appearing 'better than it is' within the scope of disapproval of a section patently concerned only with confusion. Thus, in the case before us, proof of violation of the statute requires first, description and definition of the superior counterpart, and second, proof that the consumer is likely to mistake the inferior for the superior". Appellants contend that in the case at bar they did not make an inferior product appear to be a superior one. They argue that the ingredients used in their pies are the same as are normally used in making any lemon pie, and that therefore by adding color they are not making their product appear "better than it is". We depart from the record here long enough to observe that it is extremely doubtful whether housewives normally use artificial color in home-baked lemon pies. That it is not necessary to use artificial dye in order to achieve the lemon yellow color (which appellants admit the public demands) was amply shown by the Hanscom pie which the Commonwealth introduced in evidence. This pie, according to the uncontradicted testimony of Mr. Hanscom, contains "no coloring of any kind", neither natural or artificial, other than the color imparted by butter, lemon juice, egg yolks, starch, salt, syrup, sugar and water. Nevertheless, its finished appearance resembled that of appellants' artificially colored pie. The evidence also shows that a lemon pie "is yellow in accordance with the amount of eggs" it contains; furthermore, that eggs impart "nutrition and coloring". The lower court logically concluded that appellants added U. S. Certified Color to make their pie appear to contain more eggs; or, in other words, to make it "appear better or of greater value than it is". Moreover, this use of the artificial coloring of necessity would conceal "inferiority" and tend to "de-

ceive or mislead the purchaser". In *Cott Beverage Corp. v. Horst,* 380 Pa. 113, 110 A. 2d 405, Chief Justice STERN said: "It is true that, even if an article is not itself harmful for human consumption, its use may be regulated and restricted, or even wholly forbidden, by legislative authority if involved in its use there is danger of fraud or deception whereby it may be imposed upon the public as a counterfeit article for the genuine". See also *Carolene Products Co. v. Harter,* 329 Pa. 49, 197 A. 627; *Commonwealth v. Hettinger,* 152 Pa. Superior Ct. 242, 31 A. 2d 599.

Appellants next ask (a) "can a single piece of competing pie serve as a standard of comparison particularly if there is no evidence as to how it acquired its color", and (b) "can a witness testify as to the ingredients of a pie who has not participated in or supervised its mixture or baking". Mr. Hanscom produced a pie baked in his bakery and testified as to the ingredients which went into it. Appellants' objection is directed to the proposition that the witness did not have personal knowledge of the baking of the pie, nor of the ingredients it contained. However, Mr. Hanscom was testifying as to acts done in the regular course of his bakery business. The pie selected was not baked specially but was simply one taken from the shelf, out of the regular stock. As a witness with over 25 years experience operating a bakery, he was qualified to testify concerning the processes used therein. See *Davis, Trustee v. Southern Surety Co.,* 302 Pa. 21, 153 A. 119; *Gloeckler v. Imrie,* 118 Pa. Superior Ct. 441, 179 A. 883. The basis of appellants' complaint seems to be directed to the fact that some natural or artificial color may have been added to the Hanscom pie to give it its deep yellow color. However, Mr. Hanscom stated categorically that "no coloring of any kind" had been added to his sample pie.

Appellants next contend that the prohibition of the use of the Jell-O product when shipped into Pennsylvania from New York violates "the Commerce Clause" of the Constitution of the United States. They cite *Schollenberger v. Pennsylvania,* 171 U. S. 1, 18 S. Ct. 757, wherein a statute prohibiting the sale of oleomargarine in Pennsylvania was held invalid. The statute there considered could not be sustained because it was a blanket prohibition not based upon a showing of fraud or deception. However, it was expressly pointed out in that case that oleomargarine might be excluded from sale within Pennsylvania if it were colored in such a way as to make it deceptive. The Supreme Court cited the earlier case of *Plumley v. Massachusetts,* 155 U. S. 461, 15 S. Ct. 154, which dealt with a statute making it unlawful to sell oleomargarine "which shall be in imitation of yellow butter". Justice HARLAN said: "We are of the opinion that it is within the power of a state to exclude from its markets any compound manufactured in another state, which has been artificially colored or adulterated, so as to cause it to look like an article of food in general use, the sale of which may, by reason of such coloration or adulteration, cheat the general public into purchasing that which they may not intend to buy". Substantially the same holding is found in *Commonwealth v. Caulfield,* 211 Pa. 644, 61 A. 243. It seems apparent that the Act and the Regulation here attacked fall within the class of cases holding that a state may enact legislation dealing with deceptive coloring, and that such legislation does not impose an unconstitutional burden on interstate commerce.

It should be further noted that the Pennsylvania legislation does not prevent the shipping into, or sale of the Jell-O product within, this Commonwealth. Indeed, the product is freely sold for home use through-

out the State.  If the ingredients alone had been held for sale after shipment in interstate commerce the situation would be entirely different.  However, the addition of egg yolks, water and pie crust makes a completely different and new product.  The Jell-O filling thus loses its interstate characteristic and becomes entirely intrastate in every respect.  In *Parrott & Co. v. Benson,* 114 Wash. 117, 194 P. 986, the Court said: "the act we are now considering can only operate after the eggs have lost their status as articles of foreign or interstate commerce, and have become a part of the great mass of domestic property as completely as though produced within our borders.  Surely when an egg reaches a restaurant, hotel or bakery and is taken from the package, cooked or mixed with other ingredients, and served to the guest or purchaser as food, it requires no argument or cavil that it is no longer an article of foreign commerce over which Congress alone has control; otherwise no article once brought from without into the state no matter how changed by any conceivable process, could ever become subject to state legislation; but authorities are as numerous as the question is simple".  When objects of commerce come within the sphere of state legislation the state may exercise its independent judgment and prohibit what Congress did not see fit to forbid: *Weigle v. Curtice Bros. Co.,* 248 U. S. 285, 39 S. Ct. 124.  The case of *United States v. Sullivan,* 332 U. S. 689, 68 S. Ct. 331, cited by appellant, clearly does not apply here.  The sulfathiazole tablets there involved were not mixed, changed or processed in any way; but, instead, remained in the same form from the time they were placed in interstate commerce until they were sold to the consumer.

Appellants further argue that Congress has already occupied this field of regulation by passage of

the Federal Food, Drug and Cosmetic Act of 1938. This Act, 21 U.S.C.A. 331 (k), prohibits: "(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded". The Act further provides (342 (b)(1)) that a food shall be deemed adulterated: "If any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor; or (3) if damage or inferiority has been concealed in any manner; or (4) if any substance has been added thereto or mixed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is". Reliance is placed on *Cloverleaf Co. v. Patterson,* 315 U. S. 148, 62 S. Ct. 491, for the propostion that where Congress has legislated in a particular field, state action can be upheld only if there is no conflict between the federal and state enactments. Appellants contend that the federal Act, quoted above, is for all intents and purposes identical with the State provision. However, in *Savage v. Jones,* 225 U. S. 501, 32 S. Ct. 715, the Supreme Court said: "Can it be said that Congress, nevertheless, has denied to the State, with respect to the feeding stuffs coming from another State and sold in original packages, the power the State otherwise would have to prevent imposition upon the public by making a reasonable and nondiscriminatory provision for the disclosure of ingredients, and for inspection and analysis". In the *Cloverleaf Co.* case, supra, Mr. Justice REED said: "When the prohibition of State action is

not specific but inferable from the scope and purpose of the federal legislation, it must be clear that the federal provisions are inconsistent with those of the state to justify the thwarting of state legislation". The mere circumstance of identity does not automatically invalidate State measures: *California v. Zook,* 336 U. S. 725, 69 S. Ct. 841. "An unexpressed purpose of Congress to set aside statutes of states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous": *Penn Dairies v. Milk Control Commission,* 318 U. S. 261, 63 S. Ct. 617. The intent of Congress to supersede the exercise of the police power by a state must be clearly manifested. The repugnance and conflict must be so direct and positive that the two Acts cannot be reconciled or consistently stand together: *Kelly v. Washington,* 302 U. S. 1, 58 S. Ct. 87. See also *Royal Baking Powder Co. v. Donahoe,* 265 Fed. 406.

Appellants' final contention is that the prohibition violates Article I, Section 9 and Article III, Section 7 of the Pennsylvania Constitution, and Article XIV, Section 1 of the Constitution of the United States, in that it is arbitrary, capricious, and discriminatory, and denies appellants due process and equal protection of the law. They contend that, insofar as the statute and regulation prohibit U. S. Certified Color, they do not constitute a valid exercise of the police power. However, there is no conceivable subject of legislation more peculiarly within the police power of a state than food stuffs: *Carolene Products Co. v. Harter,* 329 Pa. 49, 197 A. 627. See also *Commonwealth v. Kevin,* 202 Pa. 23, 51 A. 594. In fact, appellants concede that "it is within the police power of the legislature to exercise control over the use of coloring where it is used to deceive the consuming public". *Gambone v. Pennsylvania,*

375 Pa. 547, 101 A. 2d 634, is cited for the proposition that the exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case. We are not in disagreement with this principle. However, we are unwilling to say that the exercise of the police power in the present case can be classified as either unreasonable, unduly oppressive or patently beyond the necessities of the case. It seems clear that lemon pies having the appearance which appellants say make them saleable can be made and are made without the use of artificial coloring.

Nor can it be said that section 3 of the Statute is so vague and indefinite as to violate due process. We have had no difficulty in ascertaining the intent of the statute. Appellants complain that there is no "standard" by which to judge a lemon pie. However, they have set a standard by adding color to a degree which their survey shows is acceptable to the public. The Hanscom pie, without added color, meets this standard. The language found in *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U. S. 483, 75 S. Ct. 461, expresses the latest view on police power as it relates to due process. There Mr. Justice DOUGLAS said: "The Oklahoma law may exact a needless wasteful requirement in many cases. But it is for the legislature, not the Courts, to balance the advantages and disadvantages of the new requirement . . . But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough if there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it".

Judgments affirmed.

WOODSIDE and ERVIN, JJ., took no part in the consideration or decision of this case.