Commonwealth *v.* DiMeglio, Appellant.

120

Argued January 9, 1956. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Lewis H. Van Dusen, Jr.*, with him *Ernest L. Nagy, Henry S. Drinker* and *Arthur D. Wingebach*, for appellants.

*Lois G. Forer*, Deputy Attorney General, with her *Herbert B. Cohen*, Attorney General, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, April 16, 1956:

These appeals involve the construction and application of the Act of May 13, 1909, P. L. 520, as amended,

31 PS §1 et seq., known and hereinafter referred to as the General Food Law.

Appellants were convicted in a summary proceeding before a justice of the peace on a charge of violating the General Food Law and the regulations of the Department of Agriculture published in connection therewith, by offering for sale lemon pies containing artificial color. The Court of Quarter Sessions of Delaware County allowed an appeal and after a hearing de novo without jury at which extensive testimony was taken, defendants were again found guilty. The court en banc dismissed defendants' motion in arrest of judgment and later sentences of fines and costs were imposed. Appeals were taken to the Superior Court which affirmed the judgment of the court below in an opinion reported in 179 Pa. Superior Ct. 472, 117 A. 2d 767. We allowed appeals from the decision of the Superior Court.

Appellants, Frank DiMeglio and Nick DiMeglio, are the proprietors of a restaurant and cafeteria business in the City of Chester. A representative of the Department of Agriculture in the regular course of his duties visited appellants' restaurant and obtained two pieces of lemon pie which were being held for sale to the general public. It is not disputed that these pieces of pie contained U. S. Certified Color in the form of artificial coal tar dye.[1] They had been baked by the appellants and were made by adding a certain amount of eggs and water to a pie filling mix known as "Jell-O Lemon Flavor Pie Filling and Pudding". This mix was made by the General Foods Corporation in New York where it is packaged and shipped to the appellants in five-

---

[1] U. S. Certified Color is a harmless dye, purchased from manufacturers thereof after certification by the United States Government and is safe for use in food products.

pound packages, the label of which specifies that U. S. Certified Color is contained therein.[2]  It was conceded by the Commonwealth at the trial that the presence of artificial color did not make the pies in question in any way unwholesome or harmful to health.

Section 1 of the General Food Law, supra, makes it unlawful for any person to offer for sale any article of food which is adulterated within the meaning of the Act.  Section 3 of the Law provides, inter alia, "That for the purpose of this act, an article of food shall be deemed to be adulterated, . . . Fourth. If it be mixed, colored or changed in color . . . whereby damage or inferiority is concealed, or so as to deceive or mislead the purchaser; or if by any means, it is made to appear better or of greater value than it is.".  Section 8 charges the Department of Agriculture with the duty to enforce the Act and to ". . . make rules and regulations for the proper enforcement thereof . . .", including rules and regulations setting up definitions and standards of articles of food.  Pursuant to Section 8, the Department of Agriculture has promulgated certain regulations.  Section 604 of these regulations defines

---

[2] With respect to the distribution of this product, it appears from the trial judge's opinion ". . . That General Foods, a Delaware Corporation, having its principal place of business in New York City, sells Jell-O-Pie Filling in all 48 states. That it also sells a grocery size package (3¼ oz.) for household use and has sold this product in Pennsylvania and elsewhere for about 12 years, the volume of business in Pennsylvania of the pie filling in 1952 was approximately $120,000.00 and its sales volume of Jell-O-Pie Filling nationally, amounted approximately to $1,900,000.00 in the year 1952 . . . That pies made from Jell-O Pie Filling are sold in all of the other states in the United States, and no state other than Pennsylvania has attempted to prevent such sale . . . That Pennsylvania permits the sale in Pennsylvania through the usual retail grocery outlets of General Foods Jell-O Pie Filling for use in making lemon pies and puddings in homes without question or objection.".

bakery products as including pies; Section 1003 provides that "Bakery products of all varieties, except cheese crackers and cheese wafers, shall be free from added color, either of synthetic (coal tar) or natural origin. The addition of pumpkin, squash, carrots or other highly colored ingredients to bakery products, which may give the fictitious appearance of egg richness, is prohibited regardless of labeling.".

Section 1003 of the regulations clearly exceeds the authority granted by the Legislature to the Department of Agriculture by Section 8 of the General Food Law in so far as it absolutely prohibits the use of added color in pies regardless of whether or not there is or may be deception of the general public. Under Section 8 of the General Food Law, the Department of Agriculture has authority to make rules and regulations for the *proper enforcement* of the law itself, and to set up definitions and standards of articles of food. Since Section 3, Fourth, of the General Food Law prohibits the use of added color only in those cases where damage or inferiority is concealed, or where the purchaser is misled, or where the product is made to appear better or of greater value than it is, regulation 1003 is invalid to the extent that it goes further and enjoins the use of added color under all circumstances in the manufacture of bakery products. The power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute: *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U. S. 129, 56 S. Ct. 397, 80 L. Ed. 528. See *Lancaster Transportation Company v. Pennsylvania Public Utility Commission*, 169 Pa. Superior Ct. 284, 82 A. 2d 291.

We turn therefore to the statute itself. Although there are no cases interpreting Section 3, Fourth, of the General Food Law now being considered, in the recent case of *Commonwealth ex rel. Woodside, Attorney General v. Sun Ray Drug Company*, 383 Pa. 1, 116 A. 2d 833, this Court set forth the governing principles where a statute has attempted to prevent the sale of a healthful and nutritious food product. We held that in the absence of proof of customer confusion between Malt-A-Plenty base, an admittedly healthful product, and ice cream, and of any sales of Malt-A-Plenty base as ice cream, its sale could not constitutionally be restrained. We pointed out that the basis of every exercise of the police power must be to promote the health, safety or general welfare of the public. We also stated that the Legislature, under the police power, may regulate or prohibit the sale of an article even though it is not harmful for public consumption if there is danger of fraud or deception of the public in substituting an imitation article for the genuine.

Section 3, Fourth, of the Law declares a food to be adulterated if it is colored or changed in color ". . . whereby damage or inferiority is concealed, or so as to deceive or mislead the purchaser; or if by any means, it is made to appear better or of greater value than it is.". We are of the opinion that the Commonwealth has failed to prove that the pies in question were adulterated within the meaning of the General Food Law. It is undisputed that appellants' pies were free from impurities, contained sound food value, and that none of the ingredients were in any way deleterious to health. The test of adulteration within the meaning of this section of the Law is not whether the article is fit for human consumption, but whether it has been mixed or colored to conceal damage or inferiority, or in such a

manner that the public will be confused or deceived, or whether there is simulation in any manner by which an inferior product is made to resemble a superior one. Therefore the burden was on the Commonwealth to prove that appellants' pies contained damaged, inferior or less nutritious ingredients than some established standard for a lemon pie, and that the use of color concealed these defects, or that by some means an inferior pie was made to appear better than it was or to have a greater nutritional value than it actually had.

Statutes similar to that which is involved in the instant case have been considered on many occasions by the Federal Courts. In *United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage,* 187 F. 2d 967, cert. den. 342 U. S. 861, the Court of Appeals of the Third Circuit construed that portion of the Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C.A. 301 et seq., which provides that food is deemed to be adulterated if any substance is added thereto ". . . so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.". The food, Bireley's Orange Beverage, was alleged to be adulterated in that it contained certain substances, including yellow coal tar dyes, so as to make it appear better or of greater value than it is. The Court said at page 972: ". . . Without a finding that a marketable inferior product is likely to be confused with a specified superior counterpart, we think there can be no appearing 'better than it is' within the scope of disapproval of a section patently concerned only with confusion. Thus, in the case before us, proof of violation of the statute requires first description and definition of the superior counterpart, and second, proof that the consumer is likely to mistake the inferior for the superior.". The Court held that the United States could succeed only by showing that the

ordinary consumer would confuse Bireley's with pure orange juice.

In *United States v. Ten Cases, More or Less, Bred Spred, Etc., et al.*, 49 F. 2d 87 (C.A. 8), the statute being construed provided that food shall be deemed adulterated ". . . if it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed.". Bred Spred, which bore some resemblance to jam, contained substantially less fruit than ordinary commercial jam. The Court held that the product was not adulterated, saying at page 90: "It is apparent that two things were required to be proven in the case at bar, as respects adulteration: First, that Bred Spred was a damaged or an inferior food product, because one or more of its constituents was damaged, or inferior; second, that it was mixed in a manner whereby the inferiority was concealed. There was no proof of either of these matters. There was no proof that Bred Spred contained any damaged or any harmful or deleterious substance. The word 'inferiority' in the statute raises the question, What is the other member of the comparison? Or, in other words, the question, Inferior to what? The use of the word 'damage' in connection with the word 'inferiority' is significant. The word 'damage' in this connection means that an ingredient has suffered a loss of strength or quality; the word 'inferiority' means that an ingredient is, in the first instance, of low grade or quality. Nothing of this kind is shown by the evidence as to the elements going to make up Bred Spred . . . The mere fact that the product contained fewer strawberries than some other product, e.g., jam, does not show that Bred Spred was inferior to jam; nor does it show that a comparison with jam was called for by the statute unless Bred Spred was being palmed off on the public as jam. No showing of this kind was made.". The *Bred Spred*

case illustrates the necessity of proving possible confusion by the public between the allegedly adulterated product and some familiar and defined standard which it resembles. In *United States v. 716 Cases, More or Less, Del Comida Brand Tomatoes et al.,* 179 F. 2d 174 (C.A. 10), the Court held that the addition of water to canned tomatoes, so as to make the article fall below the standard of canned tomatoes prescribed by regulations promulgated by the Federal Security Administrator, resulted in adulteration of that product within the meaning of the Federal Act, because an inferior ingredient (water) was substituted for tomatoes.

*United States v. 36 Drums of Pop'n Oil,* 164 F. 2d 250 (C.A. 5), arose under Sections 402(b)(3) and 402(b)(4) of the Federal Act which provides that a food shall be deemed adulterated if damage or inferiority has been concealed in any manner; and also that a food shall be deemed adulterated if any substance has been added thereto or mixed or packed therewith so as to make it appear better or of greater value than it is. In this case mineral oil for popping corn had been colored and flavored to make it look like butter or vegetable oil. No standard of identity had been set up by the Federal Administrator for the food in question but the Court took judicial notice that for use as food melted butter was superior to mineral oil, and therefore found the mineral oil to be adulterated by having its inferiority to butter concealed.

The Commonwealth failed to prove the existence of any standard for lemon pie. "A definition and standard of identity, in the first instance, describes a food in terms of its ingredients, its characteristics, its derivatives, and methods of preparation.": Food Regulation and Compliance, 1948, Herrick, Vol. 1, pages 311-312. Regulations of the Department of Agriculture which absolutely prohibit the use of artificial coloring

in commercial lemon pies without regard to other ingredients obviously does not constitute the establishment of a definition and standard, but rather, as already pointed out, is an unauthorized attempt to prohibit the use of color without regard to deception of the public. In the absence of such a defined standard, it was necessary for the Commonwealth to prove that appellants' pie was made to appear to be some well recognized, superior article. No attempt was made to show the existence of a standard for lemon pie which had been so established by commercial bakers or customer expectation as to be definable. In fact the trial court specifically found that there is no standard formula for making lemon pies as the recipes in the most popular cook books and recipes generally in use in restaurants, institutions and homes vary greatly.

It is perhaps only a crystallization of the obvious to state that there can be no concealment of damage or inferiority in a particular food product unless there is a showing in the first instance that the food is damaged or inferior. The addition of color is not prohibited unless it serves to hide deficiencies in the finished product. How were appellants' pies damaged or inferior? Even granting that all lemon pies must contain certain essential ingredients, there was no evidence presented to indicate that appellants' pie lacked any such necessary ingredient or that the U. S. Certified Color was used as a substitute therefor. Certain evidence was presented at the trial tending to show that another commercially sold pie, a Hanscom pie, was of approximately the same deep yellow color as those of appellants, and this was obtained without the use of artificial color. However, the Commonwealth did not attempt to prove, nor did the lower court find, that the Hanscom pie contained more egg yolks or other ingredients than appellants'. The evidence indicated

that both pies contained approximately the same quantity of egg yolks and indeed, the court en banc expressly found that there was no difference in the food value of the naturally and artificially colored pies. Moreover there was no evidence whatsoever that anyone was deceived into believing that appellants' pie contained more egg yolks or other ingredients than it actually did.

The opinion of the Superior Court appears to be based on assumptions that a lemon pie filling is yellow in accordance with the amount of egg yolks contained therein, that the use of U. S. Certified Color made appellants' pie appear to contain more eggs than it actually did, and that appellants' pie contained fewer eggs than a Hanscom pie. However, these factual assumptions made by the Superior Court are in conflict with the findings of fact which are amply supported by the evidence. The hearing judge found: "That egg yolks, in whatever quantity used, do not give a lemon pie the color of the outside of a lemon, which is the color the pie made from Jell-O Pie Filling had".[3] The court en banc found "There was no difference in the food value of the naturally and artificially colored pies.".[4] In short, the findings of fact do not support

[3] Appellant points out that the Superior Court was not aware of the fact that after conference of counsel for both sides and the trial judge, the latter's opinion was amended from "The defense in this case may be summarized as follows:" to "The facts proved by the defense in this case are as follows:" for the purpose of making it clear that formal findings of fact were intended. The Commonwealth does not challenge this statement by appellant.

[4] From the record it is apparent that the color of the Hanscom pie was due to the use of frozen spring eggs which, because of the feed then available to the hens, have a darker color than winter eggs. If defendants cannot use U. S. Certified Color in making their lemon pies the color which appeals to the public, they will be precluded from using fresh eggs in their pies except in the spring,

any conclusion that appellants' pies were deficient in egg yolks or any other nutritional elements. And, as above stated, there is no evidence that any member of the public was deceived into believing that appellants' pie contained more egg yolks or lemons, or any other nutritional element than it actually did, or that appellants' pie was confused by the public with any defined or established superior product. Furthermore the alleged adulterated food may not serve as its own standard. Such procedure was expressly stricken down in *United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage,* supra.

The statute does not prohibit the addition of a constituent which merely improves the appearance of a product, but instead forbids any treatment that seems to enhance its nutritional or intrinsic value but, in actual fact, does not. The U. S. Certified Color imparted to appellants' pie the yellow appearance that the public desires in a lemon pie. While it is true that the use of artificial color thereby makes the pie more salable and hence in that sense more valuable, this is not what is forbidden by the statute. It is the use of color whereby an article of food is made to appear better than it actually is that is forbidden, not the use of color whereby the food is made more attractive or appealing to the eye. In *Lexington Mill & Elevator Co. v. United States,* 202 F. 615, aff'd 232 U. S. 399, the Circuit Court of Appeals for the 8th Circuit held that bleaching to make bread white, although it was baked from straight (not patent) flour, did not conceal inferiority or violate the Federal Food and Drugs

and will be compelled to use only frozen eggs for which dark yolked spring eggs are used, although fresh eggs are unquestionably as nourishing and wholesome, if indeed not more desirable. It may be added that there was no proof that the Hanscom pie established or conformed with a defined standard for commercial lemon pie.

Act of 1906,[5] even though thereby the product became the same color as bread baked from patent flour and made white by a certain process of conditioning the wheat and milling the flour traditionally used in the business. In reversing the decision of the District Court the Court stated at page 623: ". . . while patent flour obtains a higher price in the market than straight flour, this is not due to any superiority in patent flour from a nutritious standpoint, but is due to the fact that bread baked from it is whiter in appearance, *and hence more pleasing to the eye.* This aesthetic result can be obtained by a certain process of conditioning the wheat and milling the flour. Was it the intention of the statute that this process should have a monopoly? Whiteness in flour is a desirable end in and of itself. Its connection with flour of any particular grade is purely incidental. We are not persuaded that by the bleaching process flour is so colored as to conceal inferiority, or that by it flour is adulterated within the intent of subdivision four of section 7 of this act.". (Emphasis supplied). There can be no concealment of damage or inferiority, or appearing better or more valuable than it is, unless the food, as offered for sale, is defective, damaged, inferior, or of less nutritional value than it appears to be. Where the treatment of the particular article of food brings about a product which is in all respects exactly what it purports to be, as is true in the instant case, there is no violation of the law. We do not believe the Legislature intended to ban harmless coloring of products which cannot reasonably be confused with superior foods.

---

[5] The Food and Drugs Act of 1906, c. 3915, 34 Stat. 768, which, inter alia, in subdivision four of Section 7 declared food to be adulterated "if it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed".

Discussion of other arguments presented is not necessary. For the reasons stated herein the convictions must be set aside.

Judgments reversed.