**[J-72-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| EDWARD J. O'DONNELL | : | No. 8 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court entered |
| | : | December 18, 2020 at No. 880 C.D. |
| | : | 2019, reversing the Order of the |
| ALLEGHENY COUNTY NORTH TAX | : | Court of Common Pleas of Allegheny |
| COLLECTION COMMITTEE, AND | : | County entered June 11, 2019 at No. |
| BOROUGH OF FOX CHAPEL AND FOX | : | SA-17-001040. |
| CHAPEL AREA SCHOOL DISTRICT | : | |
| | : | ARGUED: October 27, 2021 |
| | : | |
| APPEAL OF: BOROUGH OF FOX CHAPEL | : | |
| AND FOX CHAPEL AREA SCHOOL | : | |
| DISTRICT | : | |

**OPINION**

**JUSTICE WECHT**                                **DECIDED: DECEMBER 27, 2021**

After observing fraud perpetrated by his employer against the United States of America, Edward J. O'Donnell stepped into the role of "relator" (colloquially, a "whistleblower") under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732.[1]

_____

[1] The FCA "was enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." *Vermont Agency of Natural Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 791 (2000) (internal quotation marks omitted). Section 3729 of the FCA imposes civil liability upon "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). Pursuant to Section 3730 of the FCA, a private person, known as a relator, may bring a qui tam action against the alleged false claimant on behalf of the federal government, *id.* § 3730(b)(1). The federal government may choose to intervene in the action and take over the

In this whistleblower capacity, O'Donnell filed a federal qui tam action[2] in 2014 alleging, on behalf of the United States, that his employer violated the FCA. As a financial incentive to take on this role, the FCA provides relators with a portion of any award that the federal government obtains in the qui tam action. The United States government ultimately settled with O'Donnell's employer. O'Donnell received a 16% share of the settlement, or $34,560,000. The question before the Court today is whether this qui tam award is taxable in Pennsylvania as compensation under Section 303 of our Tax Reform Code, 72 P.S. § 7303. For the reasons that follow, we hold that it is. Thus, we reverse the order of the Commonwealth Court.

The parties have stipulated to the facts that underlie this matter. O'Donnell was a resident of the Borough of Fox Chapel ("Borough") and lived within the Fox Chapel Area School District ("School District") (collectively, "Taxing Authorities") during the 2014 tax year. In June 2014, O'Donnell filed a qui tam action in federal court, alleging that his employer, a financial institution, violated the FCA. The federal government intervened in the action and began prosecuting the case. Ultimately, in August 2014, the Department of Justice, acting on behalf of the United States, entered into a global settlement agreement with O'Donnell's employer, which, *inter alia*, resolved the claims related to O'Donnell's allegations. Thereafter, in December 2014, the United States government

---

prosecution of the case. *Id.* § 3730(b)(4). If the action is successful, the relator receives a share of the proceeds of the action or settlement of the claim, regardless of the federal government's involvement. *Id.* § 3730(d).

[2]     Qui tam comes from the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," meaning "who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency of Natural Res.,* 529 U.S. at 768 n.1 (internal quotation marks omitted).

entered into a settlement agreement with O'Donnell, whereby O'Donnell received a 16% share of the total settlement.

Initially, O'Donnell reported this whistleblower payment as compensation on his 2014 Pennsylvania personal income tax return, and paid taxes accordingly. However, O'Donnell later filed a petition for refund. On September 26, 2018, the Pennsylvania Board of Finance and Revenue ("the Board") ordered the Pennsylvania Department of Revenue ("the Department") to refund to O'Donnell the personal income tax which he had paid on the whistleblower payment. The Department subsequently filed a petition for review in the Commonwealth Court, challenging the Board's decision and order. That petition is currently before the Commonwealth Court and has been stayed pending resolution of the present case.

Meanwhile, Keystone Collections Group ("Keystone"), the tax servicer for the School District and the Borough, discovered that O'Donnell did not file a local earned income tax return for the 2014 tax year. On May 24, 2017, after referencing the earnings that O'Donnell reported to the Department in his initial personal income tax return for 2014, Keystone mailed O'Donnell a notice that his local earned income tax for that year was delinquent in the amount of $437,194.92, consisting of $345,599.92 in earned income tax, $51,840 in statutory interest and penalties, and $39,755 in costs. On August 21, 2017, O'Donnell filed a petition for administrative appeal, followed, on September 28, 2017, by a "Supplement to Petition for Appeal." In these submissions, O'Donnell alleged, *inter alia*, that the whistleblower payment was not taxable earned income subject to the School District's Earned Income Tax Resolution or the Borough's Earned Income Tax Ordinance for the 2014 tax year.

By way of background, the School District and the Borough derive their authority to impose earned income tax from the Local Tax Enabling Act ("LTEA"), 53 P.S. §§ 6924.101 *et seq.*, which authorizes certain political subdivisions to impose a tax on the earned income of their residents. Relevantly, pursuant to the LTEA, the School District and the Borough are members of the Allegheny County North Tax Collection District, and they levy earned income tax at the combined effective rate of 1%.

The Borough's Earned Income Tax Ordinance in effect during the 2014 tax year incorporates by reference the definitions set forth in the LTEA, including the definition of "earned income."[3] The School District also levies a tax on "earned income" consistent with the definition in the LTEA, as the School District derives its authority to collect earned income tax exclusively from that Act.[4] The LTEA defines "earned income," in pertinent part, as "[t]he compensation as required to be reported to or as determined by the [Department] under section 303 of the . . . Tax Reform Code of 1971 [("Tax Code")], and rules and regulations promulgated under that section." 53 P.S. § 6924.501 (footnote omitted).

> Section 303 of the Tax Code, in turn, defines "compensation," in relevant part, as:
>
> All salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered whether directly or through an agent and whether in cash or in property . . . .

72 P.S. § 7303(a)(1)(i). Additionally, the Department's regulations provide, in relevant part, as follows:

---

[3]     *See* Borough of Fox Chapel Ordinance No. 687 at § 2.

[4]     *See Ski Roundtop, Inc. v. Fairfield Area Sch. Dist.*, 533 A.2d 828, 831 (Pa. Cmwlth. 1987).

Compensation includes items of remuneration received, directly or through an agent, in cash or in property, based on payroll periods or piecework, for services rendered as an employee or casual employee, agent or officer of an individual, partnership, business or nonprofit corporation, or government agency. These items include salaries, wages, commissions, bonuses, stock options, incentive payments, fees, tips, dismissal, termination or severance payments, early retirement incentive payments and other additional compensation contingent upon retirement, including payments in excess of the scheduled or customary salaries provided for those who are not terminating service, rewards, vacation and holiday pay, paid leaves of absence, payments for unused vacation or sick leave, tax assumed by the employer, or casual employer signing bonuses, amounts received under employee benefit plans and deferred compensation arrangements, and other remuneration received for services rendered.

61 Pa. Code § 101.6(a).

Relying upon the above provisions, the Appeals Board of the Allegheny County North Tax Collection Committee ("Appeals Board") denied the petition for administrative appeal, concluding, *inter alia*, that O'Donnell's whistleblower payment constituted compensation and, thus, was taxable earned income subject to the School District's Earned Income Tax Resolution and the Borough's Earned Income Tax Ordinance for the 2014 tax year. In so finding, the Appeals Board explained that:

By bringing his Qui Tam action on behalf of the United States of America, . . . Taxpayer acted as an "agent" of the United States Government pursuant to 61 Pa. Code § 101.6(a), and the compensation received as a result of his services rendered constitute[s] taxable earned income at the local level.[5]

Thus, the Appeals Board denied relief.

On December 13, 2017, O'Donnell appealed the decision to the Allegheny County Court of Common Pleas, which affirmed, finding that the whistleblower payment was taxable as earned income at the local level. In so doing, the court looked to the definition

---

[5] Decision of the Appeals Board of the Allegheny County North Tax Collection Committee, 11/16/17, at 2.

of "compensation" in the Department's regulation and applied that definition to the instant matter, explaining that, to be considered compensation for tax purposes, the payment must be for services rendered as an "employee or casual employee, agent or officer of an individual, partnership, business or nonprofit corporation, or government agency."[6] The court determined that, here: O'Donnell acted as an agent of the federal government when he filed the qui tam action, as the FCA requires the whistleblower in a qui tam action to bring the action on his own behalf and on behalf of the United States government, *see* 31 U.S.C. § 3730(b)(1); O'Donnell complied with that directive when he affirmatively filed the lawsuit on behalf of the United States; and the amount of money that O'Donnell was to receive was contingent upon the success of the lawsuit, thus evincing a relationship with the federal government. Accordingly, the court concluded that, because O'Donnell received the whistleblower payment while acting as an agent of the federal government, the payment constituted taxable compensation. Thus, the court entered judgment against O'Donnell in the amount of $437,194.92. O'Donnell filed a petition for review in the Commonwealth Court.

An *en banc* panel of the Commonwealth Court reversed. *O'Donnell v. Allegheny Cnty. N. Tax Collection Comm.*, 880 C.D. 2019, 2020 WL 7413634 (Pa. Cmwlth. filed Dec. 18, 2020).[7] Preliminarily, the court explained that the Borough's earned income tax

---

[6] Tr. Ct. Op., 6/11/2019, at 3 (quoting 61 Pa. Code § 101.6(a)).

[7] Before the courts below, O'Donnell also alleged that his underlying petition for administrative appeal should be deemed approved because, he claimed, his appeal was not heard and decided by the Appeals Board within sixty days of the date the petition was received, as required by Section 8433 of the Local Taxpayers Bill of Rights, 53 Pa.C.S. § 8433. The trial court rejected this argument, and the Commonwealth Court concluded that the trial court's determination in this regard was supported by the evidence of record. As this issue is not before us, we do not address it.

ordinance expressly incorporates the definitions contained in Section 501 of the LTEA, which defines "earned income" as "[t]he compensation as required to be reported to or as determined by the [Department] under section 303 [72 P.S. § 7303] of . . . the Tax Reform Code of 1971, and rules and regulations promulgated under that section." *Id.* at 6 (quoting 53 P.S. § 6924.501). As a result, the court next turned to Section 303 of the Tax Code, observing that the Tax Code sets forth eight classes of income to be taxed as personal income in Pennsylvania, including, as relevant herein, "compensation," *id.* (citing 72 P.S. § 7303), defined in the Tax Code as "salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered, whether directly or through an agent, and whether in cash or property." *Id.* at 6 n.10 (quoting 72 P.S. § 7301(d)).

Given that qui tam payments are not explicitly included in the definition of "compensation" under either the Tax Code or the Department's regulations, the court opined that "the determination of whether such a recovery is taxable for [earned income tax] purposes comes down to whether said recovery fits, or arguably fits, into one of the kinds of compensation contemplated in the Tax Code." *Id.* at 21. Emphasizing that, to be considered "compensation," a payment must be made "for services rendered as an employee or casual employee, agent or officer," *id.* (quoting 61 Pa. Code § 101.6(a)) (emphasis omitted), the court reasoned that, here, O'Donnell must have received the whistleblower payment for services rendered, which necessarily required either that he was employed by the federal government or that he served as its agent. The court found that O'Donnell was neither.

In this regard, the court noted that, in determining whether someone is an employee for purposes of workers' compensation or unemployment compensation, courts consider the degree to which an individual's efforts were under the control of another. Applying that standard to determine whether O'Donnell was an employee of the federal government, the court observed that O'Donnell himself initiated the qui tam litigation, and the federal government had little to no control over him, as O'Donnell could have moved forward with the litigation on his own if the federal government had elected not to pursue the case. Thus, the court concluded that O'Donnell was not an employee of the federal government.

The court likewise found that O'Donnell was not an agent of the United States of America, given that the Department of Justice assumed primary responsibility for prosecuting the qui tam action once it decided to proceed with the litigation, and whistleblowers are not vested with any governmental power. In support of its conclusion, the court rejected any attempt to "shoehorn Taxpayer's qui tam recovery into a type of compensation that is taxable" for earned income tax purposes, stressing that the Commonwealth's tax laws are to be narrowly and strictly construed against the government and in favor of the taxpayer. *Id.* at 22.

The court next considered whether the whistleblower payment was taxable under Pennsylvania law as an award. The court determined that it was not. While Taxing Authorities likened the qui tam proceeds to an award of damages in a lawsuit, the court disagreed, explaining that, although O'Donnell received the whistleblower payment as a result of initiating the lawsuit, the recovery was not tied to any damages sustained by O'Donnell and, thus, was "not part of an effort to make [him] whole." *Id.* at 10. The court

further found that the whistleblower payment was not a reward for O'Donnell's efforts, observing that rewards typically are established and announced as an incentive for a particular outcome, whereas, here, there was no guarantee that O'Donnell would receive any financial recovery for his efforts.

Emphasizing that the General Assembly has had "ample time" since the FCA's adoption in 1863 to include the proceeds from qui tam recoveries in the Commonwealth's tax laws if it wished to do so, the court concluded that the whistleblower payment was not taxable for earned income tax purposes. The court opined that "[i]t seems incongruous that, on the one hand, we would encourage individuals to ferret out government waste, and, on the other hand, we would punish them by taxing the proceeds for doing so." *Id*. at 10. Accordingly, the Commonwealth Court reversed the trial court's order.

Judge Ellen Ceisler authored a concurring and dissenting opinion, joined by Judge Renée Cohn Jubelirer. Judge Ceisler disagreed with the majority's conclusion that the whistleblower payment did not constitute taxable income for local earned income tax purposes. In Judge Ceisler's view, the definition of "compensation" set forth in Section 303(a)(1)(i) of the Tax Code, rather than the Department's administrative regulation, controlled. Judge Ceisler reasoned that, because the definition set forth in Section 303 is broader than the regulation and does not contain language making the taxability of remuneration contingent on the recipient's employment status, the question of whether O'Donnell was an employee or agent of the federal government was not relevant to the question of whether the whistleblower payment constituted compensation. Rather, observing that the purpose of a qui tam cause of action is to "incentivize private citizens to aid the federal government in rooting out fraud and corruption," Judge Ceisler explained

that she would characterize the whistleblower payment as an "incentive payment," which is listed as compensation under Section 303(a)(1)(i) of the Tax Code, and, thus, is taxable income.[8] Judge Ceisler emphasized that, here, O'Donnell was aware when he initiated the qui tam action that he could benefit financially from it, thus incentivizing him to bring the action in the first place and to actively assist the federal government once it began prosecuting the case. As a result, Judge Ceisler would have affirmed the trial court's order.

Taxing Authorities subsequently filed a petition for allowance of appeal. We granted allocatur in order to consider the question of whether a qui tam payment constitutes taxable "earned income" under the LTEA.

Taxing Authorities assert that the Commonwealth Court erred in holding that the whistleblower payment is not compensation and, thus, not taxable earned income. They note that the United States government taxes qui tam payments, and they suggest that all other states do as well. As a preliminary matter, Taxing Authorities take issue with the Commonwealth Court's reliance on the definition of "compensation" found in the regulation, noting that the regulation requires that there be a nexus between the payor and the recipient of the payment in order for the payment to be considered compensation—*i.e.*, the remuneration must be received for "services rendered as an employee or casual employee, agent or officer of an individual, partnership, business or nonprofit corporation, or government entity"[9]—a requirement which is not included in the Tax Code's definition of compensation. Indeed, Taxing Authorities observe that the

---

[8]      *Id.* at 12 (Ceisler, J., concurring and dissenting).

[9]      Appellants' Brief at 14-15 (quoting 61 Pa. Code § 101.6(a)).

statutory definition merely defines compensation as "salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered whether directly or through an agent."[10]

Taxing Authorities maintain that applying the relationship requirement from the regulation would render portions of the Tax Code's definition inoperable, noting, for example, that the statute lists "commissions" and "tips" as forms of compensation, but that it would be highly unlikely that the payor and recipient of a tip would have a relationship of the sort sufficient to satisfy the regulation's requirement. Likewise, Taxing Authorities contend that this Court previously found in *Commonwealth v. Staley*, 381 A.2d 1280 (Pa. 1978), that commissions earned by a life insurance agent are taxable compensation even though they are not earned through an employer/employee relationship. Taxing Authorities argue that, because the regulation is narrower than—and arguably at odds with—the more expansive definition in the Tax Code, the statutory definition of compensation should control, emphasizing that "the power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute."[11]

Looking solely to the definition contained in the Tax Code, Taxing Authorities contend that the whistleblower payment is indeed compensation and, thus, taxable.

---

[10]    *Id.* at 13 (quoting 72 P.S. § 7303(a)(1)(i)).

[11]    Appellants' Brief at 15-16 (quoting *Commonwealth v. DiMeglio*, 122 A.2d 77, 80 (Pa. 1956)).

Specifically, Taxing Authorities claim that the payment is an incentive, which, they note, is a payment made for the purpose of inducing performance and is explicitly listed in the statutory definition of compensation. In this regard, Taxing Authorities argue that qui tam awards or settlements incentivize whistleblowing, highlighting that, under the FCA, the greater the whistleblower's effort and level of participation in the case, the greater his or her possible share of an award or settlement.[12] Taxing Authorities suggest that the possibility of receiving a share of the proceeds of a qui tam award or settlement in this case induced O'Donnell to bring the action against his employer and to assist the federal government in its prosecution thereof, as exhibited by his "substantial contribution to the prosecution of the action," which resulted in him receiving a 16% share of the settlement.[13]

Alternatively, Taxing Authorities assert that the whistleblower payment constitutes "similar remuneration received for services rendered" under the Tax Code's definition of compensation. 72 P.S. § 7303(a)(1)(i). Taxing Authorities characterize this language as a "limited catch-all" provision that includes other payments similar to those explicitly recognized as compensation in the definition, such as stock options, which this Court has found to be "other compensation . . . for services rendered," and, thus, taxable earned income under the LTEA, notwithstanding that these payments are not specifically listed in the Tax Code's definition. *See Marchlen v. Twp. of Mt. Lebanon*, 746 A.2d 566, 569 (Pa. 2000). Indeed, consistent with this interpretation, Taxing Authorities stress that the Department itself has stated that, "if a particular item of income is not explicitly listed in

---

[12]     *Id.* at 29 (citing 31 U.S.C. § 3730(d)(1)).

[13]     *Id.* at 31 (citing 31 U.S.C. § 3730(d)(1)).

the definition . . . the relevant inquiry is 'whether the payment is a substitute for income that would have been included in one of the eight classes of income subject to Pennsylvania Personal Income Tax.'"[14]

Here, noting the United States' strong interest in "identifying and ferreting out fraud," Taxing Authorities maintain that whistleblowers provide valuable services to the federal government by initiating and participating in qui tam actions under the FCA and providing the government with information related thereto.[15]  Taxing Authorities further assert that a majority of federal courts have held that "a qui tam award is given in exchange for information and services and is based entirely on the whistleblower's information and personal efforts," which Taxing Authorities suggest supports a similar finding under Pennsylvania law.[16]  Accordingly, Taxing Authorities contend that qui tam payments are indeed rewards for those services, or bounties, and likewise fall within the definition's catch-all provision, rendering the whistleblower payment taxable compensation on this basis as well.

Finally, Taxing Authorities claim that, even if we were to apply the regulation, the whistleblower payment would still be taxable compensation because O'Donnell acted as an agent of the federal government when he brought the qui tam lawsuit.  In so asserting, Taxing Authorities note that our Court has recognized the existence of an agency relationship based upon the following three elements: "(1) the manifestation by the

---

[14]     Appellants' Brief at 26-27 (quoting Pa. Ltr. Rul. PIT-06-007).

[15]     *Id.*

[16]     *Id.* at 28 (citing *Alderson v. United States*, 718 F.Supp.2d 1186, 1190-91 (C.D. Cal. 2010)).

principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking."[17]

Applying that standard to the facts of this case, Taxing Authorities argue that the first element of an agency relationship is satisfied because the United States government statutorily manifested its intent for a private individual to act on its behalf by expressly authorizing a person to bring a civil action for violating the FCA in Section 3730(b)(1) and requiring the action to be "brought in the name of the Government." 31 U.S.C. § 3730(b)(1). Next, Taxing Authorities suggest that, by filing the action in this case and disclosing all material evidence and information to the federal government, O'Donnell accepted the undertaking authorized by the FCA, thereby satisfying the second element of an agency relationship. Finally, Taxing Authorities assert that the third element of the agency relationship is satisfied in this case because the FCA makes clear that the government is to be in control of the undertaking. In this regard, Taxing Authorities note: that the qui tam action may only be dismissed with the government's consent, *see id.*; that the government is "not . . . bound by an act of the person bringing the action," *id.* § 3730(c)(1); that the government may settle or dismiss the action without the consent of the person bringing the action, *id.* § 3730(c)(2)(A)-(B); and that the government may impose limitations upon the involvement of the person who initiated the action, *id.* § 3730(c)(2)(C). Taxing Authorities emphasize that the government's dominant role over

---

[17]     *Id.* at 20 (quoting *Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000)).

the whistleblower in a qui tam action confirms the existence of an agency relationship between the government and the taxpayer herein.[18]

Accordingly, Taxing Authorities maintain that the whistleblower payment is taxable compensation under the LTEA and Tax Code, just as such payments are taxable for federal income tax purposes. Thus, Taxing Authorities ask us to reverse the Commonwealth Court's decision and to enter judgment in their favor in the amount of $437,194.92.[19]

---

[18]     Additionally, Taxing Authorities note that the regulation describes compensation as including services rendered as a "casual employee," which the regulation defines as "an individual who performs, or by agreement, refrains from performing, any service of whatever nature and is not an employe [*sic*]." 61 Pa. Code § 101.1. Seemingly suggesting that O'Donnell was a casual employee of the federal government, Taxing Authorities argue that the Commonwealth Court "erred by not examining the facts of this case in light of the broad regulatory definition of a casual employee." Appellants' Brief at 15 n.4. In response, O'Donnell asserts that Taxing Authorities failed to raise this argument below, rendering it waived.

[19]     The Department has filed an *amicus curiae* brief in support of Taxing Authorities in this matter, noting that it has a direct interest in the outcome of this case because it is vested with the authority "to determine the tax liability of taxpayers subject to personal income tax," Department's Brief at 2 (citing 72 P.S. §§ 7338, 7355), and to "prescribe, adopt, promulgate and enforce rules and regulations relating to any matter or thing pertaining to the administration and enforcement of the provisions of [the Tax Code] and the collection of taxes imposed by Article III [of the Tax Code]," *id*. at 3 (quoting 72 P.S. § 7354).

The arguments raised in the Department's brief are similar to those advanced by Taxing Authorities. The Department also asserts that the regulation does not specifically define the term "compensation," but, rather, provides a "non-exclusive list of remuneration that meets the definition of compensation," as exhibited by the regulation's use of the word "includes" immediately before its list of various types of remuneration. *Id*. at 6-7. Thus, the Department maintains that the regulation's reference to remuneration in the context of employer/employee and principal/agent relationships is not a limitation on the scope of what is considered compensation under the Tax Code, but, instead, is an example of "common . . . items that qualify as compensation." *Id*. at 10.

The Department suggests that its position in this regard is consistent with its longstanding interpretation of the regulation, highlighting that, when it amended its personal income tax

In response, O'Donnell contends that the Commonwealth Court properly concluded that the whistleblower payment is not taxable as earned income. Initially, to the extent that Taxing Authorities suggest that the Tax Code's definition of compensation should control over the regulation, O'Donnell maintains that Taxing Authorities waived that argument by failing to raise it before the lower courts. Indeed, O'Donnell claims that Taxing Authorities argued below only that the whistleblower payment was taxable compensation because O'Donnell received it for services he provided while acting as an agent of the federal government—consistent with the regulation. As a result, O'Donnell argues, Taxing Authorities may not now shift their position and allege that the Tax Code and regulation conflict or that the Tax Code definition should prevail.

In any event, O'Donnell contends, the definitions in the Tax Code and the regulation do not conflict, but, rather, must be read in tandem when determining whether the whistleblower payment constitutes taxable compensation. According to O'Donnell, this is because the Borough and the School District derive their authority to levy and collect an earned income tax from the LTEA, and the LTEA defines "earned income" as "[t]he compensation as required to be reported to . . . the Department . . .under section 303 of . . . the [Tax Code], and rules and regulations promulgated under that section."[20] In light of this language providing that earned income is to be based both on the Tax Code's definition of compensation and the associated rules and regulations, O'Donnell

---

regulations in 1999, it specifically stated that an item of "remuneration received for services is taxable as compensation whether or not the services were rendered as, or the item is received by, an 'employe.' That is why 'compensation' has always been defined so it 'includes' (and is thus not limited to) 'items of remuneration received by an employe [*sic*].'" *Id.* at 7 n.4 (quoting 29 Pa.B. 6250 (Dec. 11, 1999)) (emphasis omitted).

[20] Appellee's Brief at 11 (quoting 53 P.S. § 6924.501) (emphasis in original).

stresses that the regulation must indeed be considered in determining whether a payment is taxable compensation. Accordingly, noting that the Tax Code defines compensation, in pertinent part, as remuneration received "for services rendered," 72 P.S. § 7303(a)(1), and that the regulation more specifically provides that compensation includes "items of remuneration received . . . for services rendered as an employee or casual employee, agent or officer," 61 Pa. Code § 101.6(a) (emphasis added), O'Donnell argues that the relevant inquiry in determining whether the whistleblower payment is taxable compensation is whether he received it for services he rendered as an employee or agent of the federal government.

While Taxing Authorities allege that the regulation is at odds with the definition of compensation in the Tax Code and, thus, should not be considered when determining whether a payment is earned income under the LTEA, O'Donnell emphasizes that the regulation existed in 2008, when the General Assembly amended the definition of "earned income" in the LTEA to specifically include both the definition of "compensation" in the Tax Code and the Department's rules and regulations thereunder. Thus, O'Donnell maintains, the General Assembly was well aware of the regulation and its language tying compensation to employer and agent-based relations, and intentionally chose to incorporate it into the LTEA definition. According to O'Donnell, requiring a nexus between compensation and an employer/agency relationship makes sense in this context, as doing so is consistent with the fact that local income tax traditionally is not a tax on all forms of income, but, rather, is more narrowly focused on taxing wages and other forms of payment of this nature. Consequently, O'Donnell argues that, because the regulation is "a duly promulgated regulation of the Department interpreting the definition of

compensation under Section 303 of the [Tax] Code," it must be given appropriate weight and deference unless it is clearly erroneous, inconsistent with the Tax Code, or unreasonable.[21]

Invoking the definition of compensation provided by both the Tax Code and the regulation, O'Donnell argues that the Commonwealth Court properly concluded that he was not an agent or employee of the federal government, and, thus, that the whistleblower payment was not compensation for local income tax purposes. More specifically, O'Donnell asserts that he did not act as an agent of the federal government when he initiated the qui tam action because there was no fiduciary relationship between him and the federal government, and because he lacked any power with respect to the federal government's actions related to the litigation. In this regard, O'Donnell highlights that he had no authority to act on the federal government's behalf with respect to the qui tam action or to bind the federal government with his actions, noting that he "brought the qui tam action first and foremost in his name as a plaintiff seeking redress from the court," *id*. at 22, and that federal courts have specifically held that "a whistleblower is not vested with any governmental power."[22]

While O'Donnell concedes that the FCA requires the action to be brought in the name of the United States of America, he stresses that his mere initiation of the action bound the federal government to nothing, as the United States alone retained the authority to intervene and proceed with the litigation, and Section 3730(c)(1) of the FCA

---

[21]     Appellee's Brief at 14.

[22]     *Id*. at 23 (quoting *U.S. ex rel. O'Donnells Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994)).

specifically provides that "if the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action."[23] O'Donnell maintains that, when the federal government decides to intervene and proceed with the qui tam action, the government alone holds control over the proceedings, including over the decision of whether to dismiss, litigate, or settle the action, all without the approval of the private plaintiff. O'Donnell asserts that the federal government's decision to intervene and ultimately settle the qui tam action in this case did not create an agency relationship. O'Donnell likewise contends that he was not an employee of the federal government, as the Tax Code defines "employee" as "any individual from whose wages an employer is required under the Internal Revenue Code to withhold Federal income tax," 72 P.S. § 7301(g), and, here, the whistleblower payment was not reported as wages paid to an employee on a federal Form W-2.

O'Donnell posits that, even if he had acted as a federal government agent or employee by bringing the qui tam action, the whistleblower payment still would not be taxable compensation because he did not receive it for services that he rendered to the federal government. Rather, O'Donnell argues, the whistleblower payment was merely an award of the share of the global settlement that he was to receive as a plaintiff in the prosecution of the action, again emphasizing that he brought the qui tam action in his name and initiated the prosecution thereof.

O'Donnell maintains that the United States' treatment of the whistleblower payment for federal income tax purposes suggests that the government did not believe that O'Donnell provided services to it as part of the qui tam action. O'Donnell notes that

---

[23]     *Id.* at 22 (quoting 31 U.S.C. § 3730(c)(1)) (emphasis omitted).

the whistleblower payment to O'Donnell is reported as "other income" in Box 3 on the federal Form 1099-MISC, a category used to report "prizes and awards that are not for services performed," as opposed to Box 7, in which "prizes and awards for services performed by nonemployees" are reported.[24]

Although O'Donnell concedes that the Internal Revenue Code does not typically inform our analysis of matters concerning Pennsylvania personal income tax, he contends that the manner in which the federal government classified the whistleblower payment for federal income tax purposes is instructive in determining whether the whistleblower payment was for services rendered, inasmuch as "the federal government is the best authority to determine whether a payment is for services."[25]  Because the federal government did not consider the whistleblower payment to be reportable for federal income tax purposes as compensation for services rendered, O'Donnell argues, the payment also should not be considered taxable compensation for purposes of Pennsylvania personal income tax or local earned income tax.

Finally, O'Donnell emphasizes that Pennsylvania's method of taxing personal income is unique because, while most other states use either a person's total federal adjusted gross income or his taxable income under the Internal Revenue Code as the base for calculating that individual's state personal income tax, Pennsylvania imposes personal income tax only on payments which fall into certain enumerated classes of income.  Accordingly, O'Donnell maintains, because qui tam payments do not fall within

---

[24]    Appellee's Brief at 28-29 (quoting 2014 Instructions for Form 1099-MISC, 5-6, available at https://www.irs.gov/pub/irs-prior/i1099msc--2014.pdf) (emphasis omitted).

[25]    *Id.* at 28 (emphasis omitted).

any of these enumerated classes of income, they are not subject to Pennsylvania and local income tax, and other states' treatment of whistleblower payments under their respective personal income tax schemes have no bearing on whether such payments are taxable under the laws of this Commonwealth. O'Donnell argues that this conclusion is "consistent with the well-settled principle that a tax cannot be implied if the income at issue does not stem from any of the eight taxable classes."[26] O'Donnell urges this Court to affirm the Commonwealth Court's decision finding that the whistleblower payment was not taxable compensation under the LTEA.[27]

The question of whether a qui tam payment is considered taxable earned income under the LTEA is a matter of statutory interpretation. As such, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Lynn*, 114 A.3d 796, 817-18 (Pa. 2015). It is well settled that, in interpreting a statute, this Court's objective is to ascertain and give effect to the intent of our General Assembly. 1 Pa.C.S. § 1921(a). The best expression of this intent is found in the statute's plain language. *Cagey v. Commonwealth*, 179 A.3d 458, 462 (Pa. 2018). If the statutory language is "clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

---

[26]    *Id.* at 15.

[27]    While the Department filed an *amicus curiae* brief in support of Taxing Authorities' interpretation of "compensation" under the Tax Code and the regulation, O'Donnell argues that "the Department is bound by the plain language of its own regulations and cannot adopt positions contrary to the language set forth in the [Tax] Code." Appellee's Brief at 16 (citing *Saturday Family LP v. Commonwealth*, 168 A.3d 400, 407 (Pa. Cmwlth. 2017) ("courts need not defer to an administrative agency's interpretation of its own regulation where that interpretation 'is clearly erroneous or inconsistent with the regulation.'")).

We construe words and phrases "according to the rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903(a). Here, we can ascertain the legislature's intent and meaning from the plain and unambiguous language of Section 303. "When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." *Commonwealth ex rel. Cartwright v. Cartwright*, 40 A.2d 30, 33 (Pa. 1944).

In Pennsylvania, compensation is taxable under the Local Tax Enabling Act ("LTEA") and the Tax Reform Code. The local earned income tax is assessed pursuant to the LTEA, 53 P.S. §§ 6924.101-6924.901. Taxable "earned income" under the LTEA is defined as "the compensation as required to be reported to . . . the Department of Revenue under [Section 303 of the Tax Reform Code of 1971], and the rules and regulations promulgated under that section . . . ." 53 P.S. § 6924.501. Section 303 of the Tax Reform Code, in turn, defines "compensation" as: "All salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered whether directly or through an agent and whether in cash or in property . . . ." 72 P.S. §§ 7303(a)(1)(i).[28] Qui tam payments are not explicitly listed in this definition. Thus, in order to ascertain whether these

---

[28] In addition to compensation, the other classes of income listed in Section 303 include net profits; net gains or income from disposition of property; net gains or income derived from or in the form of rents, royalties, patents and copyrights; dividends; interest "derived from obligations which are not statutorily free from State or local taxation under any other act of the General Assembly . . . or under the laws of the United States . . . ."; gambling and lottery winnings other than noncash prizes of the Pennsylvania State Lottery; and net gains or income derived through estates or trusts. 72 P.S. § 7303(a)(2)-(8).

payments constitute taxable compensation, we must determine whether they fall within any of the categories of compensation enumerated in Section 303(a)(1)(i).

To answer that question, an understanding of qui tam actions under the FCA is necessary. The FCA aims to prevent fraud upon the federal government by incentivizing private citizens, known as relators or whistleblowers, to act "for the person and for the United States Government" against the entity perpetrating fraud. 31 U.S.C. § 3730(b)(1). The action is brought in the name of the federal government. *Id.* Once the relator files suit and notifies the government, the government chooses whether to pursue the claim, to allow the relator to pursue the claim, or to seek dismissal of the claim. *Id.* § 3730(b)(2), (b)(4), (c). If the government declines to intervene, the relator has the exclusive right to conduct the action. *Id.* § 3730(b)(4). Whistleblowers, who, quite often are employed by the entity engaging in fraud, are authorized to receive a portion of the award ultimately obtained by the government in view of their role in bringing and pursuing the action. *Id.* § 3730(d). The payment is proportional to the whistleblower's efforts in the case, including the nature of the information that the whistleblower discloses to the federal government and the role the whistleblower played in advancing the case to litigation. *Id.*

The FCA "gives the relator an interest in the lawsuit, and not merely the right to retain a fee out of the recovery." *Vermont Agency of Nat. Res.*, 529 U.S. at 772 (emphasis removed). In addition to authorizing relators to act for themselves and the federal government, the FCA gives relators the right to continue as parties to the action, even where the government has assumed primary responsibility for prosecuting it, 31 U.S.C. § 3730(c)(1); entitles relators to a hearing if the government seeks dismissal of the claim,

*id.* § 3730(c)(2)(A); and prohibits the government from unilaterally settling claims over relators' objections without a specific judicial determination, *id.* § 3730(c)(2)(B).

Awarding the whistleblower a portion of the settlement allows the individual who initiated the qui tam lawsuit to share in the amount ultimately paid by the entity perpetrating the fraud, thereby providing these individuals with a financial incentive to turn on their employers. The purpose of the FCA is to "enhance the government's ability to recover losses sustained as a result of fraud against the government," and the qui tam provisions achieve incentives for "whistle-blowing insiders with genuinely valuable information." *In re Natural Gas Royalties*, 562 F.3d 1032, 1038-39 (10th Cir. 2009) (cleaned up). This incentive drives the initiation of the lawsuit, an economic reality the federal courts have recognized time and time again.[29]

---

[29] *See, e.g., Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 821 (9th Cir. 2005) ("Congress sought to provide incentives to qui tam whistleblowers to come forward. . . ."); *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (observing that, to further the purpose of recovering losses sustained as a result of fraud, Congress sought to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own."); *United States v. Northrop Corp.*, 59 F.3d 953, 963 (9th Cir. 1995) (recognizing that that the central purpose of the qui tam provisions is to "set up incentives to supplement government enforcement" and "encourage insiders privy to a fraud on the government to blow the whistle on the crime"); *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993) ("The FCA's qui tam provisions do not act as a penalty; rather, they provide incentive to government 'whistleblowers' and compensate such individuals for their time and trouble."); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d. Cir. 1991) (recognizing incentives for private enforcement of the FCA); *Rocco v. Comm'r of Internal Rev.*, 121 T.C. 160, 165 (T.C. 2003) ("The payment to a relator in a qui tam action is not a penalty imposed on the wrongdoer; instead, it is a financial incentive for a private person to provide information and prosecute claims relating to fraudulent activity."); *United States ex rel. Semtner v. Med. Consultants*, 170 F.R.D. 490, 495 (W.D. Okla. 1997) ("It is undeniable on even the most cursory review of the legislative record that the qui tam provisions were added to the FCA as an incentive to have individuals come forward with information and prosecute claims which might not be

Incentive payments are included in the statutory definition of compensation. 72 P.S. § 7303. Although "incentive payment" is not statutorily defined, an incentive is generally understood as something provided to motivate further action. Merriam-Webster defines "incentive" as "something that incites or has a tendency to incite to determination or action." *Incentive*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/incentive (last visited Dec. 3, 2021). And the term "payment" plainly includes the provision of a portion of a financial settlement, such as the percentage of the settlement contemplated in the FCA.

By the terms of the FCA, O'Donnell's qui tam payment was intended to incentivize whistleblowers like O'Donnell to identify employer fraud, initiate the qui tam action, and provide valuable information to the federal government. To compensate O'Donnell for acting as a relator under the FCA, O'Donnell received 16% of the global settlement, an amount warranted because O'Donnell's "substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). The qui tam payment plainly was O'Donnell's incentive. This incentive payment is taxable as compensation under the plain language of the Tax Reform Code, and, therefore, as earned income under the LTEA. *See Marchlen v. Twp. of Mt. Lebanon*, 746 A.2d 566, 569 (Pa. 2000) (holding that stock options granted as an award and "incentive to promote the employer's well-being" are

---

initially efficient for the government to pursue.")*; United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) (recognizing that the 1986 amendments to the FCA enhanced incentives by increasing the monetary award to relator).

"incentive payments" under the LTEA).  The plain language of the statute answers the question before us.[30]

Rather than apply the plain language of Section 303, the Commonwealth Court held that, in order for O'Donnell's whistleblower payment to be compensation, it would have to have been for services rendered, which, in turn, would require O'Donnell to be an employee of the federal government.  *O'Donnell,* 880 C.D. 2019, 2020 WL 7413634 at *9.  The Dissent likewise would conclude that Section 303's definition of compensation as imported into the LTEA reasonably suggests that an employment relationship is required.  Dissenting Op. at 2.

There is nothing in the plain language of Section 303 suggesting that an employment nexus is a prerequisite for a payment to qualify as compensation.  By omitting employment as a prerequisite, the statute plainly does not require it.  *See Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016) ("[A]lthough one is admonished to listen attentively to what a statute says, one must also listen attentively to what a statute does not say.") (cleaned up).  The plain language of Section 303 includes

---

[30]    While a qui tam payment is categorized most aptly as a taxable incentive payment, it also meets Section 303's definition of compensation for "similar remuneration for services rendered."  72 P.S. § 7303(a)(1)(i).  The qui tam payment was rendered as remuneration for O'Donnell's services in providing useful information to the federal government about his employer's fraud and for initiating the qui tam action.  *See* 31 U.S.C. § 3730 (d)(1) (tying the amount of the award to the level of contribution); *NEC Corp.*, 11 F.3d at 139 (11th Cir. 1993) ("The FCA''s qui tam provisions do not act as a penalty; rather, they provide incentive to government 'whistleblowers' and compensate such individuals for their time and trouble.").

"incentive payment" as compensation without regard to an employment relationship between the payor and payee.[31]

The Commonwealth Court's non-statutory creation of an employment requirement in Section 303 does not account for the enumerated categories of compensation contained in Section 303 that plainly do not pertain to employment at all. For example, commissions, fees, and tips routinely are provided outside of any employment relationship. As the Department of Revenue notes, contractors who submit 1099-MISC forms do so in order to report their non-employee compensation.[32] The Tax Reform Code generally recognizes non-employee compensation and requires withholding for such compensation. 72 P.S. § 7316.2. Non-employee compensation further includes real estate finder fees, referral fees, rewards for finding lost pets, and payments to artists and tradespersons.[33] There is no statutory basis for the Commonwealth Court's narrowing of taxable compensation in Pennsylvania.[34]

---

[31] Finding ambiguity as to whether Section 303 requires compensation to be tied to an employment relationship, the Dissent would apply the maxim that ambiguity in tax statutes must be resolved in favor of the taxpayer to hold that the qui tam payment is not taxable as compensation. *See* Dissenting Op. at 2-4. The statute's omission of an employment prerequisite does not render the statute ambiguous. Rather, this omission reveals that the statute, by its plain terms, does not tie compensation to employment.

[32] Department's *Amicus Curiae* Br. at 10.

[33] Department's *Amicus Curiae* Br. at 11-12.

[34] Our statutory interpretation is consistent with the Supreme Court of the United States' understanding of qui tam payments. In *Vermont Agency of Natural Resources,* 529 U.S. at 772, the High Court recognized that a relator has both "an interest in the lawsuit" and "a concrete private interest" in the outcome. The relator's interest in the lawsuit (including providing evidence, initiating the action, continuing as a party, being heard before dismissal, and objecting to the government's settlement), demonstrates the services provided by the relator. The qui tam payment vindicates the relator's private interest. This understanding demonstrates that the qui tam payment is an incentive payment and "remuneration for services rendered."

The Commonwealth Court's holding is premised upon a disregard of the statute's plain language in favor of what that court perceived to be a more limited regulatory definition of compensation. The Dissent likewise relies upon the regulation as a definition tying compensation to employment. Dissenting Op. at 3. As noted, the Department's regulation provides that "compensation"

> includes items of remuneration received . . . for services rendered as an employee or casual employee, agent or officer of an individual, partnership, business or nonprofit corporation, or government agency. These items include salaries, wages, commissions, bonuses, stock options, incentive payments, fees, tips, dismissal, termination or severance payments, early retirement incentive payments and other additional compensation contingent upon retirement, including payments in excess of the scheduled or customary salaries provided for those who are not terminating service, rewards, vacation and holiday pay, paid leaves of absence, payments for unused vacation or sick leave, tax assumed by the employer, or casual employer signing bonuses, amounts received under employee benefit plans and deferred compensation arrangements, and other remuneration received for services rendered.

61 Pa. Code § 101.6(a).

The regulation does not limit compensation to an employment relationship. Nor does the regulation define compensation. It merely offers a non-exclusive list of common examples of remuneration that the Department believes qualify as compensation. By repeatedly describing "compensation" to "include" various forms of payments, the regulation indicates its descriptive, non-exhaustive nature. *See Dechert LLT v. Commonwealth*, 998 A.2d 575, 581 (Pa. 2010) (providing that "include" is a word of enlargement and not limitation). This indication is reinforced by that last sentence of the regulation, providing a catch-all for compensation that mirrors Section 303 for "other remuneration received for services rendered." The regulation offers common examples of items that the Department believes qualify as compensation, rather than an exhaustive list.

Even assuming for argument's sake a conflict between the statute and the regulation, which there is not, courts cannot impose a regulatory requirement that is contrary to the plain statutory language. *See Commonwealth v. DiMeglio*, 122 A.2d 77, 80 (Pa. 1956) ("The power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute."). Because the statute does not make the taxability of remuneration contingent upon the recipient's employment status, remuneration for services rendered need not arise in an employment or agency context.

The Dissent posits that a qui tam payment is not compensation because a relator's actions in connection with the qui tam lawsuit can reasonably be viewed as providing services to the relator himself, and not the federal government. Dissenting Op. at 2. The Dissent relies upon *Vermont Agency of Natural Resources* as support for its position that a relator's private interest in a qui tam action lends ambiguity to the Tax Reform Code's statutory requirement that compensation be in exchange for "services rendered." Dissenting Op. at 4-5. *Vermont Agency of Natural Resources* does not support the Dissent and, in fact, supports quite the opposite.

In *Vermont Agency of Natural Resources*, the Court examined whether a relator had standing under Article III of the United States Constitution to bring suit on behalf of the United States. 529 U.S. at 771-78. "Article III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Id.* at 771 (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Article III standing requires a plaintiff to demonstrate "injury in fact"—"a harm that is both concrete and actual or imminent, not conjectural or

hypothetical." *Id.* at 771 (cleaned up). To determine whether the relator had standing under Article III, the High Court entertained and rejected two purported bases for standing before finding one that fit the circumstances and afforded such standing to the relator.

First, the Court examined whether the relator had standing as an agent of the federal government, and concluded that he did not. Although the relator brought the action in the government's name, and would receive a portion of the government's award, it was also true that "the statute gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery." *Id.* at 772 (emphasis in original). Because the FCA afforded the relator a significant role in the proceedings of the lawsuit itself, distinct from the role of the government, the Court was unable to conclude that the relator was acting solely as the government's agent. *Id.* Were the relator simply acting as an agent of the federal government, there would be no Article III standing. *Id.* Because the relator was not acting solely as an agent, the Court continued looking for another basis for standing.

The Court then examined whether the relator had Article III standing based upon his own "injury in fact." Although the relator had a "concrete private interest" in the "bounty he will receive if the suit is successful," this interest was not an "injury in fact" for purposes of Article III standing because the payment was not compensation for the violation of the relator's legally protected right. *Id* at 772-73.

Having found no agency standing or injury in fact, the High Court ultimately found that the relator possessed representational standing under Article III: "The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages

claim[,]" essentially conferring "representational standing" on the part of the assignee. *Id.* at 773.

Because the High Court recognized the relator's interest in the lawsuit and the outcome, the Dissent believes that *Vermont Agency of Natural Resources* supports its position that qui tam payments are not remuneration for services. According to the Dissent, because the relator is "principally serving himself," the relator is providing no service to the government. Dissenting Op. at 5.

Nothing in *Vermont Agency of Natural Resources* suggests that the relator's role in the litigation or interest in the award transforms the qui tam payment into something other than an incentive payment or remuneration for services rendered. Rather, the relator has both "an interest in the lawsuit" and "a concrete private interest" in the outcome. *Vermont Agency of Natural Resources*, 529 U.S. at 772-73. The relator's interest in the lawsuit (including providing evidence, initiating the action, continuing as a party, being heard before dismissal, and objecting to the government's settlement), demonstrates the services provided by the relator. The qui tam payment vindicates the relator's private interest. This understanding demonstrates that the qui tam payment is, contrary to the Dissent, an incentive payment and "remuneration for services rendered."

Moreover, *Vermont Agency of Natural Resources* recognized that a relator acts in two capacities: one serving the relator's own interest in the lawsuit, 529 U.S. at 772, and one representing the government through "a partial assignment of the Government's claim," *id.* at 773. Even if the Dissent were correct that a relator's private interest in the outcome of a qui tam action somehow meant that the relator could not receive remuneration for services rendered, this would not account for the distinct role that the

relator serves as the government's representative. As the government's representative, the relator is not "serving himself," Dissenting. Op. at 5, but is serving the government's distinct interest.

The Commonwealth Court opined that it would be "incongruous" to "encourage individuals to ferret out government waste" while nonetheless "punish[ing] them by taxing the proceeds for doing so." 2020 WL 7413634 at *10. Regardless of the Commonwealth Court's views concerning incentives and disincentives arising from the law of taxation, the judiciary is obligated to construe the plain terms of the statute. The federal government itself, which created qui tam payments in the FCA, has also chosen to tax such payments as gross income.[35] The federal government and the General Assembly are aligned in believing that taxing incentive payments is neither incongruous nor punitive.

We cannot ignore a statute's plain language in service of strictly construing tax statutes against the government. 1 Pa.C.S. § 1928(b)(3) (directing courts to construe strictly all provisions imposing taxes)); 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). There is no ambiguity or reasonable doubt that Section 303 defines compensation to include incentive payments, or that qui tam actions are incentive payments. We reverse the order of the Commonwealth Court.

Justices Saylor, Dougherty and Mundy join the opinion.

---

[35] *See, e.g., United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *Patrick v. Commissioner*, 142 T.C. No. 5 (2014); *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995); *Campbell v. Commissioner*, 658 F.3d 1255 (11th Cir. 2011); *Bagley v. United States*, 963 F.Supp.2d 982 (C.D.Cal. 2013).

Justice Todd files a dissenting opinion in which Chief Justice Baer and Justice Donohue join.